In the Matter of the Application of J. MONTGOMERY STRONG, Petitioner, for a Certiorari Order against BERNE A. PYRKE, Commissioner of the Department of Agriculture and Markets, Respondent.

Supreme Court, New York County, December 30, 1929.

*Irving·Mariash* [*Joseph F. Crater* of counsel], for the petitioner.

*Hamilton Ward, Attorney-General* [*J. D. Wilson, Jr., Deputy Attorney-General*, of counsel], for the respondent.

LEVY, J. This proceeding is in certiorari instituted by the claimant to review an award of compensation by the Commissioner of Agriculture and Markets for the destruction of some 10,000 red cedar trees pursuant to a statute which declared those trees in certain localities to be a public nuisance and actually injurious to the given fruiting apple district established by virtue of the provisions of chapter 854 of the Laws of 1923. The amount of the award was $2,500, which the petitioner claims to be grossly inadequate. The trees thus destroyed were situated on a tract of land owned by him and located between Kingston and Newburgh in this State on the west shore of the Hudson, the particular parcel consisting of 116 acres and extending one-half mile along the river bank. In the language of the learned Commissioner, a " superb river view " is afforded from the property, which is removed about one-half mile from the railroad. It is undisputed that over 10,000 trees were cut down, and that the destruction of trees around the house, the south gate and the roadway, seriously impaired the landscape effect, and thus caused the property to depreciate for estate purposes.

The statute which authorized the eradication of the trees was formerly section 171-a of the Farms and Markets Law (added by Laws of 1923, chap. 854, as amd. by Laws of 1927, chap. 207).* By subdivision 1 fruiting apple districts might be established. Subdivision 2 provided as follows: " The red cedar tree declared a public nuisance. Owning, planting, growing, propagating or keeping alive and standing upon any land or premises, of any red cedar tree or trees within the territorial limits of any fruiting apple district created as provided in this section is hereby prohibited, and any such red cedar tree or trees are hereby declared a public nuisance and may be destroyed by the agents of the state department of farms and markets."

Subdivision 4 read: " Authority to eradicate and compensation. Agents or employees of the state department of farms and markets may enter upon any land, in order to carry out the provisions of this section, and no action for trespass shall lie therefor. No compensation shall be allowed for any tree or trees destroyed, unless the owner of such lands file a claim for compensation with the state department of farms and markets within six months after the tree or trees are so destroyed, and the rate of compensation to be allowed upon such claim shall be determined by the state commissioner of farms and markets and the conservation commission after giving due consideration to any and all benefit or

* Repealed by Laws of 1927, chap. 212.— [REP.

benefits which have accrued or may accrue to said claimant or his property as an offset to the amount of any such claim."

By chapter 360 of the Laws of 1925 the Conservation Commission was eliminated from the statute as a tribunal to pass upon claims for compensation, that authority being exclusively reserved to the State Commissioner of Farms and Markets, now known by the title of Commissioner of Agriculture and Markets. It is under this amended legislation that the instant claim, having been duly filed, came up for consideration. While the statute was repealed by chapter 212 of the Laws of 1927, the claim, nevertheless, survived.

It is obvious that the purpose of section 171-a was to encourage the establishment of fruiting districts, and at the same time to exterminate red cedar trees in the vicinity to the end that grave danger to orchards might be obviated. Although the statute declared red cedar trees to be a menace, this expression must be construed in a relative sense, for, as appears from Circular 277, prepared by the very Department: " The red cedars of the Hudson Valley are esteemed for their ornamental effects by many persons who have rough hillsides covered by the natural growth, the verdure of which produces pleasing landscape effects." Moreover, at the hearing, the Commissioner himself took occasion to say: " I am perfectly willing to accept as a fact that the presence of a cedar tree is desirable. That is self-evident."

The destruction of these trees did not, therefore, constitute the extermination of an absolute menace as such, for which very likely an owner could claim no compensation, but the loss of apparently valuable property to benefit other property. For its destruction an owner could justly and properly seek indemnity, not as a matter of grace, as the Commissioner seemed to imply, but as one of right. Indeed, no altruism was here manifested by the State; rather the equitable recognition of an obligation justly flowing. In this connection it is significant that under certain conditions compensation may be recovered even for the destruction by the State of infected or diseased trees. (Agriculture and Markets Law, §§ 164, 165, added by Laws of 1927, chap. 212.) How much stronger, then, is the claim of an owner whose trees have been destroyed — although harmless and in fact valuable — for the sole purpose of conferring a special benefit on another pursuit ?

The Commissioner's award must be further measured b y the fact that he regarded the testimony offered as merely advisory, and the views of experts as of very little weight. As he put it: " My position is that I think it is the contemplation of the statute that the expert shall be the Commissioner himself." His opinion

on the statute, which undoubtedly influenced his determination, was that his judgment, as a result of his inspection of the damage, was final and that the taking of evidence was in "deference to the parties" and was, therefore, a mere gratuity. He said: "My entire feeling is that the statute does not contemplate the taking of evidence. * * * if the legislature intended to confer judicial functions on an administrative department, that attempt would be open to very serious constitutional attack. Neither this department nor the conservation department are judicial departments." The learned Commissioner, however, overlooked the fact that many administrative departments, including his own, are invested with certain quasi-judicial functions. Thus, sections 32 and 33 of the Agriculture and Markets Law provide for procedure upon complaints, and the issuance of subpœnas by the Commissioner; section 34 of that act deals with hearings before him at which witnesses may be sworn, and classes false testimony furnished by them as perjury; section 247 (as amd. by Laws of 1928, chap. 454) grants him power to investigate certain matters upon a verified complaint, and provides for testimony under oath before him with authority to make decision. Similar provisions are contained in sections 248 and 254 (as amd. by Laws of 1927, chap. 416). The Commissioner, therefore, as the police commissioner of the city of New York, and as many other lay departmental heads and their deputies, is thus invested with certain functions, which he must exercise necessarily as a quasi-judicial officer. True, the strict rules of evidence at those hearings might well be somewhat relaxed; but the proceedings are none the less formal — analogous to hearings involving workmen's compensation claims, in which a similar liberality in the matter of the rules of evidence appears to exist.

It is significant, too, that the section of the Agriculture and Markets Law which allows compensation for the slaughter of diseased animals (section 83, as amd. by Laws of 1927, chap. 432) provides for the appointment of an appraiser to determine their value. If the owner is dissatisfied with the award of the appraiser, the court may appoint a referee to redetermine the value. Both appraisers and referees may administer oaths and examine witnesses. Surely, then, if the value of diseased animals obviously destroyed for the general public good may be determined by taking evidence, compensation for the destruction of otherwise healthy trees should be awarded with at least the same safeguards of the rights of the property owner. It seems to me that unlike the provision affecting diseased animals injurious to the public health, here we have one that insures to an industry special rights and advantages to the detriment of persons who are wholly guiltless of any wrongdoing.

Whether the Commissioner was obliged to take testimony now appears to be wholly academic, for, concededly, evidence was actually taken. In the light of this, he could not properly predicate what seems to be his main, if not sole, reliance upon the conclusions apparently derived from his mere view of the property. An examination of the record thus becomes necessary to ascertain whether the award made by him is vindicated by the proofs. He evidently correctly accepted as the fundamental measure of damages the difference in the value of the property before and after the cutting. What the value was prior to the damage is subject to wide divergence of opinion. The claimant's witnesses speak of a valuation of some $40,000, while the Commissioner leans in his opinion to one between the sums of $10,000 and $25,000. On the other hand, the value fixed by the State's experts is between the sums of $13,000 and $15,000. Regardless of which estimate is the most nearly correct, there is no question that the havoc created by the destruction of the trees caused considerably more damage than determined below. The estimates of damage testified to by the witnesses for the State vary from $3,000 to $4,500, while those of the claimant's experts range between $20,000 and $25,000. Such divergence would ordinarily bar from any serious consideration what might seem as highly inflated values. It is but fair to say, however, that the State's experts omitted from their calculations the cost of removal of the stumps. The Commissioner seemed to think such removal unnecessary, and even if essential, he suggested it could be accomplished with no great effort. The evidence is overwhelmingly the other way. While there is a variance in the record as to the number of large trees, the claimant giving the actual count of more than 7,000, while the State's engineers show less than one-half, it is quite clear that the stumps cannot at this time in any event be removed merely with a " thrust of the foot," as the Commissioner in his opinion remarks. Nor is the process of decay requiring ten to twelve years any faster than in the case of other trees.

Returning now to the estimate of damage, the expert for the State who testified to a $4,500 loss computed a thirty-five per cent depreciation without including the cost of removing the stumps. The one who estimated a $3,000 loss made this observation on cross-examination: " You get me fair on this. Right around that house, it was all very, very serious damage to the property to remove those trees. They were just where they belonged." He estimated $3,000 as the damage for that particular location. His computation, therefore, seems to have been confined to that item

and included no compensation for the cost of removing stumps, although he admitted that those on the face of the ridge to the north and south of the house should be removed. The loss of landscape effect by the cutting may be said to be an element in the sale of a country estate with its limited market. As to the effect of the destruction of the trees in general, apart from landscape considerations, the Commissioner believes that the land was not very seriously denuded. But that more than 10,000 trees were removed is unquestioned. It is argued by the petitioner that about 3,000 trees on the fourteen-acre back lot were destroyed, and that these were available for transplanting. The evidence on this point is somewhat speculative as to damage. Quite apart from the fact as to how many of these trees were available for such purpose and what the owner had in mind as to utilizing them in this direction, the Commissioner's examination and experience seemed to indicate that mature trees from this locality could not be successfully transplanted. It may well be that any damage caused to this lot is sufficiently balanced by the salvage of the wood.

In the circumstances, the determination of the Commissioner is modified to the extent of increasing the compensation to the claimant to the sum of $7,000. Settle order.